UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SHYMEEKE JENKINS,                                    :

        Petitioner,                                    :

                                      14-CV-6977

        -against-                                    :

SANDRA DOLCE, Superintendent, Orleans,               :
        Correctional Facility.
                                    :

               Respondent.
----------------------------------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS
## <u>BY A PERSON IN STATE CUSTODY</u>

To the Honorable Judge of the United States District Court for the Eastern

District of New York:

### PROCEDURAL HISTORY

1.    Petitioner was convicted in the Supreme Court of the State of New York,

Kings County.

2.    The date of the judgment of conviction is November 23, 2009.

3.    Petitioner was sentenced to a 10-year prison term with 5 years of post-

release supervision.

4.    Petitioner is currently incarcerated pursuant to the judgment appealed.  No

stay has been sought.

5.    Petitioner was charged with two counts of attempted robbery in the first degree, two counts of attempted assault in the first degree, two counts of criminal possession of a weapon in the second degree, and other, lesser charges.  He was convicted of attempted robbery in the first degree (N.Y. Pen. Law § 160.15) on November 23, 2009.  He was sentenced to a 10-year prison term with 5 years of post-release supervision (Marrus, J., at trial and sentence).

6.    Petitioner pleaded not guilty to the offense charged and a trial on the issue of guilt or innocence was held before a jury.

7.    Petitioner did not testify on his own behalf.

8.    The facts of petitioner's appeal from the original judgment are as follows:

(a) Petitioner appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department arguing that he was deprived of his Sixth Amendment right to the effective assistance of counsel.

(b) The Appellate Division affirmed petitioner's conviction.

(c) The date of the Appellate Division's decision was February 13, 2013. See People v. Jenkins, 103 A.D.2d 753, 958 N.Y.S.2d 904 (2013).  The decision is attached as Exhibit A.  The Brief for Defendant-Appellant, Brief for Respondent, and Reply Brief for Defendant-Appellant are attached as Exhibits B, C, and D respectively.

(d) Petitioner sought leave to appeal to the Court of Appeals on that issue. On November 21, 2013, Judge Rivera of the Court of Appeals denied leave.  See People

2

v. <u>Jenkins</u>, 22 N.Y.3d 997, 981 N.Y.S.2d 2 (2013).  Copies of the leave application and response, and of the certificate denying leave, are attached as Exhibit E.

9.     Aside from the direct appeal from the judgment of conviction and sentence, petitioner has not filed any actions with respect to that judgment in any state court.

## STATEMENT OF FACTS

Introduction

Petitioner Shymeeke Jenkins was convicted of attempted robbery in the first degree on the theory that he committed a shooting during an attempted robbery of a liquor store on October 8, 2008.  At the suppression hearing, Mr. Jenkins's attorney called him to the stand but failed to make any argument for suppression.  At trial, defense counsel failed to present the jury with a cohesive theory of the case.  He either did not cross-examine the State's witnesses or conducted cross-examinations unrelated to their testimony on direct and did not advance any theory of defense even though the complainant had initially identified another person, Daniel Battle, as the robber.  Nor did counsel argue that Daniel Battle's unfounded accusation was the only evidence tying petitioner to the shooting or request a missing witness charge when the prosecution failed to call Daniel Battle as a witness.  Counsel also failed to make any argument that would benefit petitioner at the sentencing hearing.

The Dunaway/Huntley Hearing

Detective ANTHONY BARBEE was involved in the investigation of a shooting that occurred inside a Brooklyn liquor store October 8, 2008 (H. 7-8).[1]  A suspect in that investigation saw Mr. Jenkins in the precinct and told the detective that he should speak

---

1       Numbers in parentheses refer to pages of the trial transcript; numbers preceded by "H.," "V.D.," and "S." refer to pages of the suppression hearing, voir dire, and sentencing transcripts, respectively.

with him about it  (H. 9).  According to Detective Barbee, after petitioner signed the Miranda waiver, he immediately agreed to speak with Detective Barbee about the shooting at the liquor store.  Mr. Jenkins wrote out a statement admitting that he entered the liquor store and demanded money from the man at the cash register.  When the gun he was holding went off, he fled (H. 13-16).  Assistant District Attorney UGOEZE UKOMADU videotaped Mr. Jenkins's second statement, which included a reading and waiver of Mr. Jenkins's Miranda rights (H. 17).

On cross examination of Detective Barbee, defense counsel elicited that the suspect who directed Detective Barbee's attention to Mr. Jenkins was Daniel Battle (H. 19-20).  Counsel then asked a series of questions relating to the relative ages of Battle and Mr. Jenkins.  Detective Barbee said that petitioner was 16 years old while Battle was approximately 25 years old (H. 21-23).  Counsel also asked about the circumstances of the interview with Battle, eliciting information about the dimensions and features of the room in which Battle was interviewed and his considerable freedom of movement during his interview (H. 23).

During a brief re-direct, the prosecutor elicited that attempts to contact Mr. Jenkins's parents were made (H. 32).  Defense counsel then asked Detective Barbee whether he personally attempted to contact Mr. Jenkins's parents and whether he conferred with his supervisor about Mr. Jenkins's age, and Detective Barbee stated that he did not remember (H. 33-34).

5

Defense counsel called Mr. Jenkins to the stand and elicited that Detective Barbee read him only one <u>Miranda</u> warning, namely that he had the right to remain silent (H. 37-38). Detective Barbee then instructed Mr. Jenkins to initial and sign the <u>Miranda</u> waiver card and that he did so in response to that instruction, not because he understood and wished to waive his rights (H. 38-39). The police did not ask for his parents' telephone number and, when Mr. Jenkins asked whether his mother was "around", Detective Barbee said, "no" (H. 39).

Defense counsel then asked whether Mr. Jenkins ever sought medical attention (H. 40). Mr. Jenkins answered by explaining the sequence of events during the interview. When Detective Barbee first asked about the shooting at the liquor store, Mr. Jenkins told him that he did not know what the detective was talking about (H. 40). Detective Barbee asked petitioner why he was "playing" and said that, since Mr. Jenkins wanted to play, he was going to play, and punched him three times in the chest with a closed fist (H. 41). Mr. Jenkins then asked for medical attention, but Detective Barbee said, "well, since you want us to do something for you, you have to do something . . . and he said he wanted a confession on what happened" (H. 42). When Mr. Jenkins continued to insist that he knew nothing about the shooting, Detective Barbee punched him twice more in the chest (H. 42). Mr. Jenkins then wrote out a statement, based on details supplied to him by Detective Barbee and Battle (H. 42-43). He explained that, on the night of the shooting, he met with Battle before and after the shooting occurred, and that

after the shooting, Battle told Mr. Jenkins what had happened and asked him to take the blame, since Mr. Jenkins was a minor and Battle "couldn't afford to do it" (H. 43-44). In response to questioning about his arrest and interrogation for the instant offense, Mr. Jenkins said that Detective Barbee, upon escorting him to the interview room, handcuffed him to a pole (H. 45).

On cross examination, Mr. Jenkins testified that he sustained no bruises from Detective Barbee's punches but that he did receive medical attention at the precinct (H. 48). He had previously experienced similar chest pains for which he had sought medical attention (H. 47). He did not remember which hospital he went to, but he sought medical treatment after his chest began to hurt during a workout in the school gym (H. 60-61).

Although he had called petitioner to the stand to offer evidence of coercion, defense counsel declined to make any argument for suppression (H. 63). The prosecutor argued that Mr. Jenkins initialed every response on the Miranda waiver, that he stated on the video that he understood his rights, and that Detective Barbee testified that he read petitioner his rights (H. 64-65). She further argued that, since Mr. Jenkins was 16 at the time of his arrest, there was no legal requirement that his guardian be contacted (H. 65).

The Court credited Detective Barbee's testimony and found Mr. Jenkins's claims of being beaten to be unreliable, largely because the videotaped statement did not demonstrate that he was in pain and because Detective Barbee was a more credible

7

witness than Mr. Jenkins (Memorandum Decision of October 13, 2009 at 5, in Supreme Court file). Accordingly, the court ruled that Mr. Jenkins had validly waived his <u>Miranda</u> rights and that there was probable cause to arrest (<u>id.</u> at 6-8).

<u>Pre-trial Evidentiary Rulings</u>

Before the trial began, the court heard argument about the admissibility of certain evidence that the State hoped to introduce at trial.  The court first ruled that the State could play the tape of the 911 call made directly after the shooting (V.D. 6).  Although defense counsel stated that he was concerned that, "the tape be played in and of itself and the jury does whatever they want with it", he raised no objections to the introduction of the tape (V.D. 5-6).  Concerning the admissibility of Mr. Jenkins prior bad acts, defense counsel was not aware of any prior criminal history (V.D. 6).  The prosecutor, however, pointed out that Mr. Jenkins had recently been adjudicated a juvenile delinquent in Family Court (V.D. 7).  Defense counsel made no objection to the introduction of this prior criminal history, but the court ruled that it was inadmissible because it was unduly prejudicial (V.D. 7-8).  Defense counsel asked if it would be permissible for <u>him</u> to ask whether Mr. Jenkins had been convicted of a crime, and the court said that it would not, explaining that, generally speaking, questions about past criminality are only asked in order to impeach a witness (V.D. 9).

The prosecutor also sought to introduce the complainant's negative identification of Daniel Battle as the robber to counter the anticipated defense contention that Battle

was the robber (V.D. 10, 11). After clarifying that the complainant would not testify that Mr. Jenkins was the robber, defense counsel asked, "There is going to be no quantitative accusation saying that that is the guy? That isn't out of balance to allow them to go into – to say that he didn't identify Mr. Battle, he didn't identify anyone?" (V.D. 13). The court responded, "that is the question that I'm going to ask you" (V.D. 13). Defense counsel responded that he did intend to argue that Daniel Battle was the perpetrator, but did not object to the court's ruling that the negative identification testimony was admissible (V.D. 14). When the court further inquired whether counsel would object to Detective Barbee's testimony that Battle told him to talk to Mr. Jenkins, defense counsel stated, "I don't have a problem with that" (V.D. 13).

The prosecutor next raised the question of how to deal with the fact that Mr. Jenkins was already at the precinct when Daniel Battle identified him as the robber (V.D. 16). The prosecutor and the court were worried that it would be unduly prejudicial for the jury to hear that Mr. Jenkins had been arrested on another charge (V.D. 16). When the court asked defense counsel how this should be handled, counsel responded, "That is difficult" (V.D. 17). The court suggested that the detective could testify that Mr. Jenkins came to the precinct to be questioned about the instant case (V.D. 18). Although the State made no objection, defense counsel stated, "I don't think that is accurate", and suggested instead that the jury be told that Mr. Jenkins was at the precinct because "there is another case in the lower court and it is that case. That is why he was there. He was

9

there for the other case" (V.D. 18).  Rejecting defense counsel's suggestion, the court ruled that the jury should hear only that he happened to be at the precinct on another matter, and that Detective Barbee could testify that Daniel Battle directed him to talk to petitioner (V.D. 19).

Jury Selection

During voir dire, defense counsel asked only three questions of the potential jury members as a group: whether they understood the presumption of innocence, whether they understood that a criminal defendant had the right not to testify, and whether they understood that the State had the burden of proof (V.D. 58-59).  In response to each of these questions, a single potential juror voiced understanding (V.D. 58-59).  Defense counsel made no challenges for cause and only one peremptory challenge (V.D. 62-64).

After a jury had been selected and the jury members excused, one of the selected jurors returned and informed the court that she worked with the police and would be biased in their favor (V.D. 68-69).  Defense counsel did not object to this juror being on Mr. Jenkins's jury; instead, he asked the juror a series of rehabilitative questions (V.D. 70).  After the juror stated that she would give more weight to police testimony than the testimony of other witnesses, defense counsel asked, "Do you understand that police officers are the same as everybody else?  Do you think a police officer is capable of lying?" (V.D. 70).  The juror responded that she believed that police officers were well trained for their jobs (V.D. 70).  Defense counsel said, "I didn't ask you that.  Do you

think that a police officer is capable of lying? Yes or no?" (V.D. 70). The juror answered, "less likely" (V.D. 70). Defense counsel responded, "they are capable right? They are just like everybody else. They are capable of telling the truth, and they are capable of lying? Do you agree with that? Could you follow the evidence from the stand?" (V.D. 70). Although defense counsel did not move to strike the juror, the court stated that it seemed clear that the juror had to be discharged, and the prosecutor and defense counsel concurred (V.D. 70).

The Trial

Opening Statements

The prosecutor made an opening statement detailing the circumstances of the crime and the evidence that she planned to introduce (10-14). Defense counsel then opened with a statement that Mr. Jenkins would take the stand and would present evidence showing that he was struck by police four times (15). He further stated that, "he will tell you evidence that will show that he is innocent of the crime. The evidence will show that at the time he was 16 years old, he was alone at the precinct, his mother was not there, subject to the conduct of police officers" (15). He then advised the jury to listen to the evidence and keep an open mind (15). Counsel said nothing about Daniel Battle being the actual assailant.

The Prosecution's Case

DEREK BARRY was working in his liquor store when someone came up behind him and said "keep on walking, don't look back" (92).  He looked back anyway and saw a dark-skinned man, a little taller than 5' 10" or 5" 11" tall, 160 pounds, wearing dark pants, a hat, a grey hooded top, and a scarf around his mouth (93-94).  The hood covered the man's forehead and the scarf came up to his nose (94).  When the man demanded money, Mr. Barry told him it was in the register at the front of the store (95).  They walked to the register at the front of the store and, as Mr. Barry started to open the register, he heard a single "popping sound," at which point the man fled (96).  Mr. Barry had been shot in his hand (97).

Defense counsel asked three substantive questions during cross examination.  He asked whether Mr. Barry had told a detective that the shooter was about 23 or 24 years old, to which Mr. Barry responded, "It's possible" (111).  He asked whether Mr. Barry remembered saying that Daniel Battle was not the robber, and Mr. Barry said that he did remember (111).  And he asked how old Battle was; Mr. Barry said that he did not recall (111).

Police Officer JEFF CAMPO, who was patrolling in the area of the liquor store on the night of the shooting, stopped Daniel Battle shortly after the shooting, three or four blocks away, because he fit the description of the subject broadcast over police radio (76-80).  He was wearing a black hoodie and carrying a gray hoodie and a white

12

"windbreaker" jacket with blue sleeves" (83).  The prosecutor introduced into evidence a surveillance video showing Daniel Battle and Tyrelle Battle walking toward the liquor store before the shooting (84).  Daniel Battle had been wearing the same black hoodie and Tyrell Battle had been wearing a white jacket with blue sleeves (84-86).  Officer Campos took Battle to the crime scene for a showup (80).

On cross examination, defense counsel elicited that when Battle put on the gray hoodie, it  was tight but fit him, and that he thought Battle was in his late teens or early twenties (87).

Detective <u>ANTHONY BARBEE</u> went to the scene of the robbery and, while Mr. Barry was being treated by EMS, interviewed him (20).  According to Detective Barbee, Mr. Barry's description included that the man was 23 or 24 years old (20).  Although the court had already ruled, without objection by defense counsel, that Detective Barbee could testify that Daniel Battle told him to talk to Mr. Jenkins, when the prosecutor asked, "And what, if anything, did [Daniel Battle] tell you?", defense counsel objected (25).  The objection was overruled and Detective Barbee testified that Battle "gave [him] some information" and told him he "needed to speak to Shymeeke" (25).

Defense counsel made no objection to the prosecutor's questions about the substance of Detective Barbee's conversations with the complainant, Mr. Barry, on the night of the shooting (20, 22-23).  The prosecutor elicited from Detective Barbee the balance of Mr. Barry's description of his assailant, as well as the fact that the police

13

brought Daniel Battle to the store and that he had a gray hoodie and white windbreaker with dark sleeves balled up in his hand (21).   The police had Mr. Battle put on the jacket and the hoodie for the showup (22).   After speaking with Mr. Barry afterward, Battle was let go (22).

On cross examination, defense counsel specifically asked whether Mr. Barry said that Daniel Battle was not the robber (43).   He then asked why Detective Barbee was speaking to Daniel Battle again and elicited that Detective Barbee had "new information" about Battle, but did not ask what that new information was (44-45).   Detective Barbee agreed that Daniel Battle was a suspect, said that he took Daniel Battle out of the interview room before questioning Mr. Jenkins, and denied striking, making promises to, or coercing Mr. Jenkins to confess (47).   Counsel then asked whether Detective Barbee knew Daniel Battle's current whereabouts (50-51).   Detective Barbee said that he knew that Daniel Battle was in Virginia and that he had Daniel Battle's contact information and his father's contact information (50-51).   On redirect, the prosecutor clarified that Daniel Battle had provided Detective Barbee with a contact address in Virginia (52).

Assistant District Attorney UGOEZE UKOMADU, who had taken Mr. Jenkins's videotaped confession, testified that when Mr. Jenkins recorded his confession he appeared to be calm and in no pain, and that under New York law, there is no requirement that parents be present when a 16-year-old is in custody (57).   The prosecutor then moved to introduce Mr. Jenkins's videotaped confession (59).   When

14

asked if he had any objections, defense counsel responded, "No, sir. I have one question, though. How would she know if there's additions or deletions by looking at a disc?" (59). The court advised defense counsel that he could ask the assistant that question on voir dire (59). So counsel asked Ms. Ukomadu whether she knew that there had been no deletions or additions just by looking at the disc (60). Ms. Ukomadu explained that she had viewed the contents of the disc, then given it to the trial assistant (60). Defense counsel said, "okay" and did not object, after which the videotaped statement was played for the jury (60).

On cross-examination, defense counsel asked A.D.A. Ukomadu if she was familiar with courtrooms (62). He asked if she knew where a jury sits, where a district attorney sits, and where a defendant sits (62). Assistant District Attorney Ukomadu correctly identified the jury, assistant district attorney and the defendant and stated, in response to further questioning, that different courtrooms are arranged in different ways but that the defendant never sits next to the jury (63-64). Defense counsel asked no questions about the videotaped confession or A.D.A. Ukomadu's interactions with Mr. Jenkins.

Police Officer <u>HECTOR DELEON</u>, recovered a shell casing from the floor of the liquor store. When the prosecutor moved to introduce the shell casing into evidence, the court asked defense counsel whether he had any objection (69). Defense counsel asked Officer Deleon on voir dire whether he had picked up the shell casing with his fingers (70). Officer Deleon responded that he did (70). Counsel also asked whether the

15

shell casing was analyzed for finger prints, DNA or blood evidence (H. 70). Officer Deleon responded that he did not know, and that he had no personal knowledge of what happened to the shell casing after it was sent away for analysis (70-71). Defense counsel then objected to the introduction of the shell casing, without giving a reason, and the court overruled the objection (71). After the voir dire, the prosecutor asked Officer Deleon if there was any other forensic evidence at the scene for him to collect, and he responded that there was not (72). The prosecutor asked whether he would dust for fingerprints in an area that the perpetrator did not touch, and he responded that he would not (72).

On cross-examination, defense counsel asked whether Officer Deleon had collected any fingerprint evidence, DNA evidence or blood evidence, and Officer Deleon said that he had not (73).

The Defense Case

Without first moving for a trial order of dismissal at the close of the People's case, efense counsel called petitioner SHYMEEKE JENKINS to the stand. Despite the court's pre-trial ruling, when defense counsel asked Mr. Jenkins to tell him what happened at the precinct, Mr. Jenkins testified that he was at the precinct due to an unrelated crime when Detective Barbee brought him out of a holding cell to an interrogation room to question him about the shooting (117). When he denied any knowledge of the shooting, Detective Barbee punched him in the chest three times (118).

Mr. Jenkins asked for his asthma pump but the detective refused and, when Mr. Jenkins continued to assert that he had no knowledge of the shooting, punched him twice more (119). Detective Barbee then told him what to write in his statement and Mr. Jenkins wrote what he was told (120). Although he did not understand the Miranda warnings, he initialed the Miranda card because Detective Barbee told him to do so (125-127). Defense counsel asked Mr. Jenkins about his trip to the hospital after he gave him confessions, and Mr. Jenkins said that he didn't tell anyone about the beatings because there were police officers in the room (130-131). Counsel did not ask Mr. Jenkins about Daniel Battle telling him what happened and Mr. Jenkins offered no such testimony.

During cross examination, the prosecutor asked Mr. Jenkins about his conversations with emergency medical and hospital personnel when he received medical treatment (135-137). Mr. Jenkins consistently maintained that he did not remember the interactions to which the prosecutor referred. The prosecutor specifically asked whether he had told the doctors that he spoke at the hospital with about the beating (146). She then asked whether he told the judge during arraignment that he had been beaten (146). Mr. Jenkins answered that he had told his lawyer and his private investigator about the beatings, but agreed that he had not told any doctors or the judge (146-147).[2]

---

2      The prosecutor returned to this theme in her summation, emphasizing that he did not speak about the beating at the hospital and only told hospital personnel that he had asthma (184). She went so far as to list every hospital employee with whom he interacted, and point out that he did not tell any of them about the beating (186).

17

The prosecutor then introduced Mr. Jenkins's medical records into evidence without objection (155). The prosecutor also asked Mr. Jenkins to recount his testimony that on the night of the shooting, he did not see Battle until after the shooting (153). The prosecutor then impeached Mr. Jenkins with his testimony at the <u>Dunaway</u>/<u>Huntley</u> hearing, that he was with Tyrell and Daniel Battle before they left the house to carry out the robbery (153-154).

On redirect examination, defense counsel had only one question: "Shymeeke, do you know what soft-tissue injury is?" H. 154. Mr. Jenkins said that he did not (H. 154).

<u>The Charge Conference</u>

The court suggested submitting only the charge of attempted robbery in the first degree to the jury, and the prosecutor and defense counsel agreed (H. 157-158). The court then said that it would tell the jury that it was free to disregard any statements that it found were not given voluntarily, and asked the parties whether there were any other special charges that they wanted to submit (H. 158-159). Defense counsel said that he had been "toying around in my head about missing witness", and asked the court if it thought that a missing witness charge was warranted, given Daniel Battle's absence (H. 159). The court explained that it believed a missing witness charge was inapplicable because it appeared that Battle was in the military and therefore not available, and that Battle didn't seem to be under the control of the prosecution and didn't seem likely to

give testimony favorable to it (H. 159).  Defense counsel did not move for a missing

witness charge (H. 160).

The Defense Summation

Defense counsel opened his summation by telling the jury that nothing he said was

evidence (164).  After briefly alluding to the lack of forensic evidence tying petitioner to

the crime, he read a lengthy excerpt from petitioner's medical records (165).  According

to the records, petitioner was diagnosed with musculoskeletal chest pain, which was due

either to injury or to inflammation (165).  It then listed the symptoms associated with this

diagnosis, including the swelling of muscles, ligaments, cartilage, soft bones or bones,

sharp pain, and irritation when the chest is pressed on. (165).  After reading this excerpt,

counsel stated, "And that, I would submit, it's your call never forgetting that but I say

that supports what Shymeeke Jenkins says, he got hit five times" (165).

Counsel told the jury that, "I kind of broke this down into five scenarios the way

we went through trial" (165).  The first "scenario" occurred at the precinct where, after

Daniel Battle told an officer to speak with petitioner, "suddenly Shymeeke is making out

a statement, incriminating himself up the ying-yang here" (166).  Counsel reminded the

jury that Mr. Jenkins was 16 at the time of his confession, and stated that he was held at

the precinct for approximately eight hours, during which time he had to ask permission

to use the restroom (167).

19

Counsel described the second "scenario" as what took place in the hospital (167). Mr. Jenkins was accompanied to the hospital by police officers and he did not want them to hear him accusing other officers of the beating so he "dummied up" (167).   He reminded the jury of the medical records he had read at the beginning of his summation, saying that they said, "you have been diagnosed and your pain is due to an injury." 167.

Counsel's third "scenario" was what occurred when Mr. Jenkins was taken back to the precinct and transported to the DA's office to make a videotaped statement (168). Counsel abruptly abandoned his discussion of the five "scenarios", and instead reminded the jury that Mr. Barry was shown Daniel Battle immediately after the shooting and stated that he was not the shooter and that Mr. Barry never made a formal complaint (168-169). Counsel reminded the jury that there was no physical or forensic evidence to tie Mr. Jenkins to the crime (169).

Counsel reminded the jury again that petitioner was 16 years old at the time he made his confessions, and asked the jury to remember what it was like to be 16 years old (169).   He concluded by stating, "[i]f he wants to go to the bathroom, he's got to ask, think about that.  Thank you very much." H. 169.  Counsel said nothing about petitioner having been told to confess to details given to him by Daniel Battle and never suggested that Daniel Battle was the real perpetrator.

Deliberations and Verdict

The judge charged the jury, and it retired to deliberate (205).  After a "short recess" of approximately 10 minutes, the jury returned with a verdict of guilty of attempted robbery in the first degree (H. 205).

Sentencing

At sentencing, the prosecutor submitted a written statement and made an in-court statement advocating the imposition of the maximum sentence (S. 2).   The prosecutor emphasized Mr. Jenkins's prior criminal history, his post-incarceration behavior, his gang affiliation, and the emotional toll that the crime took on the victim (S. 2-3).   Defense counsel's response was that, "I'm not going to try to convince you of anything" (S. 4). He stated only that, "Mr. Jenkins, although he's guilty as a matter of law, continues to deny his guilt", and "as far as anything to do with while he was incarcerated, that has nothing to do with this case" (S. 4).   Although the court declined to impose the maximum sentence, it also declined to sentence petitioner as a Youthful Offender, which counsel never requested, and imposed a sentence of 10 years in prison followed by 5 years of post-release supervision (S. 6).

## GROUNDS OF UNCONSTITUTIONALITY
## OF PETITIONER'S CONVICTION AND SENTENCE

I.   PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT
     TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

In this case, defense counsel, who was obviously unfamiliar with criminal trial practice, committed error after error: at the pre-trial suppression hearing, throughout the trial, and at the sentencing hearing.  First, defense counsel had petitioner testify at the suppression hearing, but failed to make any argument for suppression based on that testimony, rendering it void of benefit to the defense, but subject to impeachment at trial by the prosecutor.  Second, counsel failed to present a cohesive, reasoned defense during trial, ignoring the theory that petitioner was innocent of the crime because another person, Daniel Battle, whom the complainant had initially identified, was the robber. Counsel also failed to request a missing witness charge when the prosecution did not call Battle as a witness even though his unfounded accusation was the only evidence tying petitioner to the crime.  Counsel then failed to object to hearsay testimony from a prosecution witness and to the prosecutor's comments during cross-examination and summation regarding petitioner's pre-trial silence.  Finally, counsel's meandering closing statement did not present a theory of the case.  The cumulative effect of these errors was that defense counsel's representation was woefully deficient, in violation of petitioner's constitutional right to effective assistance of counsel.  Accordingly, petitioner's conviction

should be reversed and a new trial ordered.  U.S. Const. amends. VI, XIV; N.Y. Const., Art I, § 6.

The United States Constitution guarantees individuals the right to assistance of counsel.  Given the "vital and imperative" function of counsel, counsel must be "effective" to satisfy the constitutional guarantee.  Powell v. Alabama, 278 U.S. 45, 71 (1932).

Under federal law, a defendant bringing a claim of ineffective assistance must show that: (1) defense counsel's conduct was deficient and (2) the deficient performance prejudiced the defense.  Strickland v. Washington, 460 U.S. 668, 687 (1984); Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001).  To demonstrate deficiency, the defendant must show that counsel's conduct "fell below an objective standard of reasonableness," Strickland, 460 U.S. at 687-88; United States v. Bettis, 28 Fed. Appx. 44, 46 (2d Cir. 2001), which is measured under "prevailing professional norms."  Strickland, 460 U.S. at 688; United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986).  To satisfy the test for prejudice, the defendant need not show that counsel's conduct more likely than not altered the outcome of the case; rather, he must demonstrate only that but-for counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different.  Strickland, 460 U.S. at 689, 694; United States v. Torres, 129 F.3d 710 (2d Cir. 1997).  While federal judicial scrutiny under the Antiterrorism and Effective Death Penalty Act ("AEDPA") must be highly deferential to state court

decisions, and the reviewing court must evaluate effectiveness from the perspective of counsel at the time of the conduct, such review is nonetheless necessary to ensure that defense counsel – who serves a "crucial role" – maintains the proper functioning of the adversarial process to ensure a fair trial and a just result.  Id. at 689, 685-86.

Counsel's numerous errors throughout this case rendered his representation so deficient as to prejudice the outcome, depriving petitioner of his constitutional right to effective assistance of counsel.

A.     Defense Counsel Had Petitioner Testify at the Suppression Hearing Without Using that Testimony to Make a Suppression Argument, Unnecessarily Subjecting Petitioner to Impeachment of His Credibility at Trial.

Conduct by defense counsel that elicits testimony damaging to the defense case can constitute deficient performance if it is not a strategic choice.  See Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir. 2002) (concluding that counsel's various deficiencies, including his questioning of witnesses that elicited testimony damaging to the defendant, were not part of a trial strategy and were predictably detrimental to the defense given that the prosecution's case was not otherwise overwhelming); see also Usher v. Ercole, 710 F. Supp. 2d 287, 310-311 (E.D.N.Y. 2010) (rejecting defense counsel's claim that his failure to object to negative testimony elicited by his questioning was part of a deliberate strategy, and determining that it was not a reasonable exercise of professional judgment).

At the Dunaway/Huntley hearing, defense counsel called petitioner to testify that his confessions were the result of physical coercion by Detective Barbee.  Presumably, the defense argument was that petitioner was arrested without probable cause and that his statement was not the result of a voluntary and knowing waiver of his Miranda warnings.  Inexplicably, defense counsel declined to make any argument for suppression based on the testimony he had elicited.

During the prosecutor's cross-examination at the hearing, she elicited that petitioner was a gang member and that he was with Daniel and Tyrell Battle at their house before the shooting.  The prosecutor used that testimony to impeach petitioner at trial when he testified that he spoke to Daniel Battle only after the shooting.  The prosecutor also relied on petitioner's own admission that he was a gang member to advocate for the imposition of the maximum sentence.

Defense counsel's decision to have petitioner testify at the suppression hearing without making an argument for suppression cannot be called a strategic decision because without argument that testimony was useless except as fodder the prosecutor could use to impeach petitioner at trial.  Counsel's deficient conduct, which resulted in the admission of detrimental testimony, in addition to counsel's other errors, cumulatively "'underscore[d] a fundamental lack of formulation and direction in presenting a coherent defense.'" Fisher, 282 F.3d at 1299 (citing Stouffer v. Reynolds, 168 F.3d 1155, 1164 (10th Cir. 1999)).

Like in <u>Fisher</u>, the prosecution's case here was not overwhelming because petitioner was never identified by the complainant as the assailant and there was no physical evidence linking him to the crime scene. The only direct evidence was petitioner's confession, which the defense claimed was physically coerced. Therefore, this error, in combination with counsel's other deficiencies, was prejudicial.

B.    <u>Defense Counsel Failed to Cross-Examine the Complainant, Derek Barry, About His Identification of Another Person As the Shooter</u>

Although the complainant, Derek Barry, initially identified Daniel Battle as his assailant, defense counsel inexplicably and unreasonably failed to cross-examine both Detective Barbee and the complainant about that identification. Counsel's failures not only were missed opportunities to establish reasonable doubt, but also left unchallenged Barry's inconsistent statements and his later identification of petitioner. Because there is no reasonable strategy that could justify counsel's course of conduct, those failures amounted to ineffective assistance of counsel.

A defense counsel's performance is deficient when he fails to confront the prosecution's "star" witness with inconsistent statements in order to weaken the witness's inculpatory testimony, <u>see</u> <u>Nixon</u> v. <u>Newsome</u>, 888 F.2d 112, 115 (11th Cir. 1989), and where he fails to "bring up glaringly obvious grounds for impeachment." <u>United States</u> v. <u>Munoz</u>, 605 F.3d 359, 381 n. 18 (6th Cir. 2010) (citing <u>Higgins</u> v. <u>Renico</u>, 470 F.3d 624, 632 (6th Cir. 2006)); <u>see</u> <u>also</u> <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 204 (2d Cir. 2001)

(finding ineffective assistance of counsel resulting from counsel's cumulative errors including "failure to investigate [which] prevented an effective challenge to the credibility of the prosecution's only eyewitness"); <u>Berryman</u> v. <u>Morton</u>, 100 F.3d 1089, 1099 (3d Cir. 1996) (finding counsel's failure to confront the reliability of the victim's uncorroborated identification "wholly unreasonable" when it "cut[] directly to the heart of the only evidence" against the defendant); <u>Blackburn</u> v. <u>Foltz</u>, 828 F.2d 1177, 1184, 1186 (6th Cir. 1987) (finding that counsel's failure to prepare to impeach a witness despite "acknowledg[ing] the centrality of [her] testimony to the prosecution's case and the vital importance of weakening her testimony" was "untenable," and so deficient); <u>Harris</u> v. <u>Senkowski</u>, 298 F. Supp. 2d 320, 337 (E.D.N.Y. 2004) (finding counsel's failure to confront a witness with her prior inconsistent statement to the police "simply inexcusable," and "[a] more compelling example of ineffective representation ... difficult to fathom").

Here, at the <u>Dunaway</u>/<u>Huntley</u> hearing, defense counsel's apparent theory was that Daniel Battle was the robber who shot the complainant, and that he told petitioner the details of the crime, to which petitioner confessed in response to physical coercion by police officers. The prosecutor admitted in her opening statement that the complainant told Detective Barbee the day after the shooting that Battle was in fact his assailant, and that his initial negative identification of Battle just after the incident had been mistaken (13). Although the prosecutor elicited during direct examination that the complainant

had recognized the clothes that Battle was wearing rather than Battle himself, the fact remains that the complainant did affirmatively identify <u>him</u>, not just the clothes, and never identified petitioner. However, counsel completely missed the opportunity to address the complainant's positive identification of Battle, and instead inexplicably and continuously emphasized his initial negative identification.

In response to direct examination by the prosecutor about what happened after the showup, Detective Barbee answered: "Daniel Battle was free to leave, he was let go. He was able to leave" (22). The only other direct testimony Detective Barbee gave with regards to the negative identification was that the complainant told him the shooter had darker skin than Battle (23). Nevertheless, defense counsel seemed intent on impressing upon the jury during cross-examination of the detective only that the complainant told the police that Battle was not the shooter: "So, if he was free to go, I take it that the complaining witness said it wasn't him, correct?" (43). Detective Battle responded in the affirmative (43). Defense counsel repeated: "And again, so he was free to go, right?" (43).


During his opportunity to question Detective Barbee, counsel failed to challenge the complainant's correction of his initial negative identification and subsequent positive identification of Battle. Rather, he asked vague questions about unspecified "new information" that influenced Detective Barbee to ask Battle back to the precinct for more questioning (45). Although Detective Barbee affirmed that there was new information,

counsel failed to pursue the point, and instead moved on to questions about Battle's identification of petitioner(45).

In <u>Nixon</u>, the court found that counsel "sacrificed an opportunity to weaken the star witness' inculpatory testimony," when "[a]t stake was the crucial identity of the person who shot the victim." 888 F.2d at 115. Given the significance of this error, the court concluded that there was a reasonable probability that the result would have been different if the witness had been appropriately impeached. <u>Id.</u> at 116. In <u>Berryman</u>, the victim presented inconsistent testimony about the heights of three defendants at two separate trials, but counsel for the defendant in the second trial failed to use these inconsistencies to impeach the victim's identification of his client. 100 F.3d at 1098. The court determined that, "it borders on the inconceivable that a trial attorney would fail to inform a jury of [the victim's] prior problems with this identification" given that "[t]he reliability of this victim's uncorroborated identification of [the defendant] cuts directly to the heart of the only evidence against [the defendant]." <u>Id.</u> at 1098-99. The court affirmed the lower court's conclusion that counsel's conduct was "wholly unreasonable," <u>id.</u> at 1099, and found the prejudice "obvious." <u>Id.</u> at 1102.

By not questioning Detective Barbee about the complainant's changing story, defense counsel failed to address "glaringly obvious grounds for impeachment" of the complainant's testimony. <u>See Munoz</u>, 605 F.3d at 381 n. 18. Meanwhile, counsel's

29

repeated confirmation of the complainant's negative identification of Battle directly contradicted the defense that it was Battle, not petitioner, who was the assailant.

Defense counsel's cross-examination of the complainant was similarly defective. Although the complainant was the State's key witness, defense counsel's cross-examination consisted of only three questions unrelated to the complainant's positive identification of Battle:

> Q   That guy who came in there with the hoodie . . . you told Detective Barry that he was about, a male black 23, 24 years old; is that correct?
>
> A   It's possible.
>
> Q   Do you recall the guy . . . that was brought back to the scene, he had on a black hoodie, he was carrying a gray hoodie, the guy that you said wasn't him?
>
> A   Right.
>
> Q   Do you remember him?
>
> A   I remember, yes.
>
> Q   Do you recall at all how old that guy was?
>
> A   No. (111).

Just as in Nixon and Berryman, defense counsel's questioning of the prosecution's identification witness completely failed to address inconsistent statements that could have impeached the witness' identification testimony. Given that the prosecutor admitted in her opening statement that the complainant corrected his negative identification of Battle the day after the incident, it is "inconceivable" that defense counsel would fail to question

the complainant about his inconsistent identifications, including his positive identification of Battle. See Berryman, 100 F.3d at 1098-99. That failure was "wholly unreasonable" given its importance to the defense theory that Battle, not petitioner, was the assailant. Id. at 1099.

Counsel's deficient cross-examination "sacrificed an opportunity" to elucidate the precise nature of the complainant's identification of Battle. See Nixon 888 F.2d at 115. If the prosecutor had not admitted that the complainant identified Battle as the assailant, defense counsel's errors would have prevented the jury from hearing about the complainant's positive identification of Battle entirely. As it were, the significance of the complainant's positive identification was likely lost on the jurors who, presented with no alternative explanation from defense counsel about the positive identification, likely credited the prosecution's argument that the identification was based on Battle's clothing and not his physical appearance.

No possible strategy could have justified counsel's error. While the decision of whether to cross-examine, and "to what extent and in what manner" are "strategic in nature," United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987), appellate courts can "second guess" decisions when "there is no strategic or tactical justification for the course taken." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). For instance, "[i]n a case that so hinges on an eyewitness's testimony ... it's difficult to assume that a reasonable tactical decision was made not to challenge that testimony." Tomlin v. Myers,

30. F.3d 1235, 1238 (9th Cir. 1994).  Here, given that undermining the credibility of the complainant's identification testimony would have contributed to establish reasonable doubt in this case, defense counsel's failure to attempt to do so was not part of a reasonable trial strategy.  See Fisher v. Gibson, 282 F.3d 1283, 1299, 1306 (10th Cir. 2002) (finding that counsel's deficient actions, including his cross-examination, which "served solely to allow prosecution witnesses to reiterate the state's evidence, and did not challenge the testimony or the witness' credibility," were not part of any trial strategy); see also Harris v. Artuz, 288 F. Supp. 2d 247, 259 (E.D.N.Y. 2003) (finding that defense counsel's failure to cross-examine witnesses such as to introduce evidence that would impeach their credibility was not strategic).  If anything, counsel's cross-examination allowed the jury to hear multiple times that the complainant said that Battle, the other possible perpetrator, was not his assailant.

In sum, given the importance of the complainant as the State's key eye witness, defense counsel's failure to impeach him with his inconsistent identifications, his repeated clarification of the negative identification of Battle, and his failure to remind the jury of the complainant's positive identification of Battle was not only ineffective representation, but also prejudiced the result.

C.    <u>Counsel Failed to Object to Detective Barbee's Hearsay Testimony That Daniel Battle Effectively Told Him That Petitioner Committed the Shooting</u>

During neither voir dire nor during trial did counsel effectively object to improper hearsay testimony damaging to the defense case.  When the court inquired during voir dire whether the defense would be objecting to Detective Barbee's testimony that "Mr. Battle is the one who told the police to go speak to" petitioner, counsel stated that he did not have a problem with the testimony (16-17).  When the prosecutor asked Detective Barbee during trial about his conversation with Battle (25), counsel voiced a general objection that was overruled, but made no further complaint about the introduction of this improper hearsay testimony.

Out-of-court testimonial statements – including testimony elicited during the course of police interrogations - by witnesses who do not appear at trial are inadmissible unless they are unavailable and the defendant had a prior opportunity for cross-examination.  <u>See</u> <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36, 53-54, 68 (2004); <u>see also</u> <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123, 136 (1968) (finding that the unreliability of incriminations from codefendants are "intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination.").

Under New York evidentiary law, police testimony concerning a conversation with a non-testifying suspect or co-defendant is "obviously improper" if it creates the "impression" that the co-defendant implicated the defendant, even if the "precise

contents of the conversation were not revealed." People v. Tufano, 69 A.D.2d 826, 415 N.Y.S.2d 42 (2d Dept. 1979); see also People v. Fairweather, 69 A.D.3d 876, 877, 894 N.Y.S.2d 81 (2d Dept. 2010) (finding a detective's testimony improper because it "directly implied" that the nontestifying complainant identified the defendant as the perpetrator); People v. Berry, 49 A.D.3d 888, 889, 854 N.Y.S.2d 507 (2d Dept. 2008) (finding that admission of testimonial hearsay in the form of a witness' implicit accusation violated the defendant's right to confrontation); People v. Jones, 305 A.D.2d 698, 699, 760 N.Y.S.2d 227 (2d Dept. 2003) (finding a prosecutor's questioning improper where it elicited testimony that the defendant was arrested shortly after the arresting detective's conversation with a nontestifying codefendant because it was "indicative of a deliberate attempt by the prosecutor to create in the jurors' minds the impression that the codefendant implicated the defendant").  The Second Circuit has similarly established that a defendant's right to confront the witnesses against him "includes the right not to have the incriminating hearsay statements of a nontestifying codefendant admitted in evidence against him," and is implicated even if the statement does not "accuse[] the defendant explicitly but ... contain[s] an accusation that is only implicit." Mason v. Scully, 16 F.3d 38, 42-43 (2d Cir. 1994); see also Ryan v. Miller, 303 F.3d 231, 248 (2d Cir. 2002) ("Testimony need not contain an explicit accusation in order to be excluded as a violation of the Confrontation Clause.").

34

A trial counsel's failure to object to the obvious violation of a defendant's confrontation clause rights can constitute ineffective assistance of counsel.  See Mason, 16 F.3d at 44; see also Henry v. Scully, 918 F. Supp. 693, 714-15 (S.D.N.Y. 1995), aff'd, 78 F.3d 51, 52 (2d Cir. 1996) (finding support for an ineffectiveness of counsel claim based on counsel's "clearly unreasonable" and "grave" failure to object to the admission of a codefendant's confession and inadmissible hearsay from a detective, which "powerfully incriminated" the defendant).  Although deference must be paid to the strategic choices of counsel, "'not all strategic choices are sacrosanct.  Merely labeling [counsel's] errors 'strategy' does not shield his trial performance from Sixth Amendment scrutiny.'" Henry, 918 F. Supp. at 715 (quoting Quartararo v. Fogg, 679 F. Supp. 212, 247 (E.D.N.Y.), aff'd, 849 F.2d 1467 (2d Cir. 1988)).

The facts of this case are very similar to those in Mason, 16 F.3d 38.  Here, Detective Barbee was permitted to testify that during Battle's interrogation as a suspect in the shooting, Battle "gave [him] some information and informed [him] that [he] needed to speak to [petitioner]" (25-26).  In that case, during Mason's trial, the prosecutor's questioning of a detective elicited the fact that the detective's conversation with one of the three nontestifying codefendants led him to pursue the defendant.  Id. at 40-41.  The defendant's trial counsel made no objection to the prosecutor's questions, nor did he move to strike or limit the prosecutor's use of that testimony.  Id. at 41.  The court found it immaterial that the contents of the codefendant's statement were not revealed in detail

because "the plain implication that the prosecutor sought to elicit, and emphasized in his summation, was that the conversation with [the codefendant] led the police to focus on [the defendant]."  Id. at 43.  The court concluded that the prosecutor's implication was an obvious impropriety, and the trial counsel's failure to object or attempt to strike the testimony was not tactical, but rather constituted performance falling below the constitutional standard.  Id. at 44.  It also found counsel's error prejudicial because the "State's evidence against [the defendant] was certainly not overpowering," since there was no physical evidence and none of the witnesses could specify a distinguishing characteristic enabling them to identify the defendant.  Id. at 45.

Here, Battle's out-of-court statement to Detective Barbee, which was clearly testimonial since it was made during a police investigation, was inadmissible.  See Crawford v. Washington, 541 U.S. 36, 53-54, 53 n. 4 (2004) (finding that a witness' statement, knowingly given in response to structured police questioning, qualified as "testimonial").  Like in Mason, Detective Barbee's testimony suggested that he switched to questioning petitioner as the result of learning Battle's information, which the jury could only have concluded implicated petitioner in the crime.  Petitioner's constitutionally protected confrontation clause right, which grants him the right not to have Battle's incriminating hearsay statement admitted in evidence against him, was violated by Barbee's revelation of Battle's implicit accusation.  See Mason, 16 F.3d at 42-43.

36

In sum, defense counsel's failure to object constituted ineffective assistance of counsel, see id. at 44, and the outcome of the trial likely would have been different absent the implication that Battle accused petitioner because the State lacked physical evidence linking him to the crime and the complainant never positively identified him as the assailant.

D.     Counsel Failed to Object to the Prosecutor's Comments During Cross-Examination and Summation About Petitioner's Pre-Trial Silence

Throughout the trial, defense counsel failed to object to the prosecutor's repeated insinuation that petitioner's pre-trial silence regarding the fact that Detective Barbee struck him meant that it was not true.

Although pre-trial silence may be admissible for impeachment after a defendant waives his Miranda rights, Jenkins v. Anderson, 447 U.S. 231, 238-39 (1980), a prosecutor's overemphasis of a defendant's silence may be improper.  See Gravley v. Mills, 87 F.3d 779, 788 (6th Cir. 1996).  Counsel's failure to object to instances of prosecutorial misconduct, including improper comments about a defendant's post-arrest silence, is compelling evidence of incompetence.  See id. at 785-86.

In this case, the prosecutor attempted to impeach petitioner's credibility during cross-examination by suggesting that the fact that he did not tell certain people that Detective Barbee struck him was suspicious.  First, the prosecutor asked during cross-examination whether petitioner told the doctors at the hospital about the beating (146).

Petitioner responded that he told his private investigator and his lawyer.  During summation, the prosecutor emphasized that petitioner did not tell anyone at the hospital about the beating, and listed the various hospital employees to whom he did not disclose that fact (184).  What the prosecutor failed to acknowledge was that petitioner was accompanied by police officers to the hospital and would naturally have been apprehensive to accuse Detective Barbee of beating him.  Next, the prosecutor asked whether petitioner told the judge during arraignment that he had been beaten (146).  However, arraignment is not the appropriate forum in which to raise an involuntary confession claim, so the fact that petitioner did not tell the judge was irrelevant.

In Gravley, the court determined that the prosecutor crossed the line by repeatedly referencing the defendant's silence during his preliminary and probation revocation hearings to insinuate his guilt and imply that he was lying.  87 F.3d at 788.  The court found that "[c]ounsel's ineffectiveness at trial" and her incompetence, as evidenced by her failure to object to the prosecutor's improper comments, "allowed the prosecutor to continually imply to the jury that [the defendant's] failure to assert his story earlier, even though he had a constitutionally protected right to remain silent at those earlier moments, was evidence of his guilt." Id. at 786.  The court concluded that counsel's incompetent failure to object to the prosecutor's improper references was prejudicial, especially since the defendant's credibility was such an important issue in the case. Id. at 790.

Here, although the prosecutor's repeated emphasis on petitioner's silence was clearly improper, see Gravley 87 F.3d at 788, defense counsel nevertheless failed to raise specific objections to them either during cross examination or during summation. Counsel only made one general objection when the prosecutor stated that petitioner did not tell any hospital employees that Detective Barbee "assaulted him" (147).  The court overruled the objection and after the prosecutor rephrased her question, defense counsel did not object again to the prosecutor's question confirming that petitioner did not tell any doctors he was assaulted.  Counsel's failure to effectively object to the prosecutor's repeated references to petitioner's pre-trial silence contributed to his overall ineffective representation, allowing the jury to believe that it could consider petitioner's silence as evidence of his lack of credibility.  Given that the defense case depended on the jury believing petitioner's testimony that his confession was physically coerced, there is a reasonable probability that the outcome would have been different but-for counsel's incompetence.  Cf. Luna v. Cambra, 306 F.3d 954, 961, 966, amended by, Luna v. Cambra, 311 F.3d 928 (9th Cir. 2002) (finding that counsel's failure to interview and subpoena alibi witnesses prejudiced the outcome of the trial);

   E.   Counsel Failed to Request a Missing Witness Charge for Daniel Battle

Despite the obvious importance of Daniel Battle to the State's theory that petitioner was the complainant's assailant, defense counsel inexplicably failed to request a missing witness charge when the prosecution did not call him as a witness.

A party's failure to produce a witness in its "control" whose testimony would "elucidate the transactions," if produced, creates the presumption that the testimony would be unfavorable to that party.  Graves v. United States, 150 U.S. 118, 121 (1893). "A 'missing witness' charge allows the jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of the facts."  Robinson v. Graham, 671 F. Supp. 2d 338, 350 (N.D.N.Y. 2009). To warrant this jury instruction, the party requesting the charge must establish that: (1) the witness has knowledge material to the trial; (2) the witness would naturally be expected to give noncumulative testimony favorable to the party who failed to call the witness; and (3) the witness is available to the party who would be expected to call the witness.  Id. (citing People v. Gonzalez, 68 N.Y.2d 424, 509 N.Y.S.2d 796 (1986)); Horton v. Ercole, 557 F. Supp. 2d 308, 330 (N.D.N.Y. 2008).

In this case, given that Battle easily satisfied the requirements for a missing witness charge, defense counsel should have requested the instruction.  First, Battle was knowledgeable about evidence material to the trial because his accusation that petitioner was the robber was the only link - other than petitioner's coerced statements to the police - between petitioner and the crime.  Second, Battle's testimony would have been non-cumulative since he would be the only eye-witness against petitioner.  Lastly, Battle would naturally give testimony favorable to the prosecution in accordance with his interview with Detective Barbee and because his accusation of petitioner diverted the police

40

investigation away from himself.  The court's assertion that Battle was under the control of the defense because he was a member of petitioner's extended family was plainly incorrect.

Additionally, although the court assumed that Battle was unavailable due to vague references to his service in the military, the burden would have been on the State to make an affirmative showing of his unavailability.   A missing witness charge is not required "where the government can show 'the witness'[s] whereabouts are unknown and that diligent efforts to locate him have been unsuccessful,'" Rivera v. Keane, No. 99 Civ. 1272(DC), 1999 WL 816178, *1, *6 (S.D.N.Y. October 13, 1999) (citing People v. Gonzalez, 68 N.Y.2d 424, 428, 509 N.Y.S.2d 796 (N.Y. 1986)).  Here, however, the prosecutor made no such a showing.  Under New York state law, "'[a]n out-of-state witness is not necessarily unavailable,'" and "'the mere fact of absence from the State does not negate control,' because '[t]here is a procedure available to the prosecution for the production of an out-of-state witness,' namely New York Criminal Procedure law § 640.10." Cato v. Superintendent of Groveland Corr. Facility, 463 F. Supp. 2d 367, 376 (W.D.N.Y. 2006) (citing People v. Jackson, 122 A.D.2d 566, 566, 504 N.Y.S.2d 953 (App. Div. 4th Dept. 1986)).

The only evidence in the record about Battle's whereabouts at the time of the trial was elicited during cross-examination of Detective Barbee, who testified that he believed Battle was living in Virginia, that he had not informed Battle that the case was going to

trial, and that he had no knowledge of whether Battle was serving in the military (50-51). The prosecutor elicited that Detective Barbee did have Battle's current contact information, though she was never called upon to describe what efforts, if any, were made to produce him since defense counsel failed to request a missing witness charge. If the burden had been placed on the prosecutor to make an affirmative showing of Battle's unavailability, the mere fact that he may have been out-of-state would not have been sufficient to warrant his classification as "unavailable" absent a showing that "diligent efforts" had been made to locate him. See Rivera, No.99 Civ. 1272(DC), 1999 WL 816178, at *6.

In Henry v. Scully, 918 F. Supp. 693 (S.D.N.Y. 1995), defense counsel failed to request a missing witness charge for a confidential informant although the informant met the requirements for the charge. Since counsel recognized the informant's importance and argued that the jury should draw a negative inference against the prosecution for its failure to call him as a witness, the court determined: "[n]o possible strategy could support the failure to request a missing witness charge, which the New York Court of Appeals has recognized as a potentially powerful tool for the defense." Id. at 718, 716. The Second Circuit affirmed: "[C]ounsel should have made such a request because there was no downside to doing so and there was a potential benefit to be gained." Henry v. Scully, 78 F.3d 51, 53 (2d Cir. 1996).

Here, although it is clear from defense counsel's cross-examination of Detective Barbee that he was "toying around in [his] head about missing witness" at least as early as the opening day of the trial and asked the court whether the charge applied (159), he never requested the missing witness instruction.  In response to the court's stated opinion that Battle did not qualify as a missing witness, for which the court cited reasons that had absolutely no basis in the trial record, counsel did not protest or press the court on its incorrect assertions, but merely thanked the court and abandoned the subject entirely (159-60).  Counsel did not mention the issue again until the charge conference, after both parties had rested.

New York state courts require the party seeking the charge to promptly notify the court of an uncalled witness who may be knowledgeable about a material issue.  See Gonzalez, 68 N.Y.2d at 427.  Here, counsel not only failed to raise the issue in a reasonably prompt manner, but also failed both to make an affirmative request for the charge and to challenge the court's incorrect assertions regarding its applicability to Battle.  Defense counsel's recognition that a missing witness charge may apply, as manifested by his statement that he was "toying with" the idea, demonstrates that he recognized Battle's importance to the case.  This, in addition to the fact that Battle was the only witness whose truthful testimony would have wholly corroborated petitioner's involuntary confession, compels the conclusion that "no possible strategy" could support

43

counsel's failure to request the charge since there was no downside to doing so and only a potential benefit to be gained.  See Henry 78 F.3d at 53.

Because of counsel's failure to request the charge, the jury was not informed that it should draw a negative inference from the prosecutor's decision not to call Battle as a witness.  This error was clearly prejudicial given Battle's unquestionable importance to this case: he was picked up blocks away from the crime scene carrying the clothes that the perpetrator had worn; the complainant told Detective Barbee the day after the incident that he recognized Battle as the robber; video footage from the night of the shooting shows Battle walking toward the liquor store immediately before the shooting occurred; and Battle told Detective Barbee that he should speak to petitioner, thus initiating the investigation into him as a suspect.  Battle's particular importance to the defense theory was also unquestionable since petitioner had testified at the suppression hearing that it was Battle, not him, who shot the liquor store owner and asked petitioner to take the blame for the shooting since he was a minor and, therefore, "couldn't get in much trouble" (H. 44).  Given Battle's unique importance and the fact that his testimony would have elucidated contested issues of fact in the trial, defense counsel's error contributed to his ineffectiveness and prejudiced the outcome.

F.   Counsel's Disjointed and Irrelevant Summation Failed to Present the Defense Theory of the Case and Did More to Advance the Prosecution's Case

At petitioner's trial, counsel's summation as a whole was disjointed, largely irrelevant, relied on evidence not in the record, and did nothing to advance the most viable defense theory of the case. In fact, defense counsel's closing statement did more to advance the State's case than petitioner's defense.

The constitutional right to effective assistance of counsel extends to closing arguments. See Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Therefore, an "incompetent summation can demonstrate ineffective assistance of counsel . . . ." United States v. Jordan, 927 F.2d 53, 57 (2d Cir. 1991) (finding that counsel in that case gave a satisfactory summation); see also Stouffer v. Reynolds, 214 F.3d 1231, 1234 (10th Cir. 2000) (finding counsel's performance deficient because of various errors including the presentation of closing arguments that were ineffective at proffering "any semblance of a defense theory"). Evaluation of an ineffective assistance claim based on an attorney's summation requires the court to assess the effectiveness of the summation as a whole. See United States v. Salameh, 54 F. Supp. 2d 236, 255 (S.D.N.Y. 1999).

Defense counsel stated at petitioner's pre-trial evidentiary hearing that he intended to raise in his defense that Battle committed the crime (V. 14). Although counsel did not make an argument after the hearing, petitioner's testimony made clear that the defense theory was that Daniel Battle was the perpetrator of the shooting:

45

he came in the house and he told me that something just happened.  And I asked him what, he told me, and then he told me he needed me to do him a huge favor . . . . That favor was for me to take the blame 'cause he couldn't afford to do it, and being that I was young ... I couldn't get in much trouble.  So I asked him what he needed me to do.  He told me what happened. (44).

During his opening statement, counsel promised the jury that, "evidence will show that [petitioner] is innocent of the crime" (15).  The theory of the case articulated by defense counsel and elicited in petitioner's testimony at the suppression hearing was that Battle committed the shooting and described to petitioner the details, which petitioner incorporated into his physically-coerced written and videotaped confessions.

Without pursuing a different or contradictory defense, defense counsel seemed to abandon this theory at trial.  Although counsel asked Detective Barbee during cross-examination about his receipt of new information that renewed his suspicion of Battle (42-45), he made no attempts to present this theory to the jury and asked petitioner no questions relating to the night of the crime during direct examination.  During his summation, counsel made no attempt to establish that Battle was the perpetrator as was promised during his opening statement.  If anything, he reinforced the contrary theory by stating that the complainant did not identify Battle because the perpetrator's skin color had been darker (168).

Rather than actually advocating for his client, defense counsel read a lengthy excerpt from petitioner's medical records describing the diagnosis of musculoskeletal

46

chest pain (164-65).   Although the doctor had written that the condition was equally likely to be caused by inflammation as by injury, and petitioner testified during cross-examination that he had previously gone to the hospital for chest pain pre-dating the incident (47), defense counsel nevertheless claimed that the diagnosis proved petitioner's story that "he got hit five times" (165).  The prosecutor easily undermined the already-limited probative value of the medical records by pointing out during summation that defense counsel had neglected to read the section of the excerpt stating that it referred to the right side of petitioner's chest, whereas petitioner testified that Detective Barbee struck him on the left side (186).  Far from lending support to the defense theory of physical coercion, defense counsel's selective presentation of the medical records more likely hurt his case by undermining petitioner's credibility with the jury.

Defense counsel's disjointed summation continued to meander pointlessly when he announced that he would lay out five "scenarios" of the case (165).  The first "scenario" was Daniel Battle being interrogated at the precinct and implicating petitioner in the crime, but defense counsel did not advance the theory that Battle was the true assailant.  Instead, he simply reminded the jury that Battle was interrogated because he had "something to do with" the crime, which implied that he was in a position to know that petitioner was the perpetrator (165).  Rather than arguing that Battle was the true assailant, defense counsel's summation could easily have supported the prosecution's

theory that Battle's involvement in the crime was limited to accompanying petitioner to the store and taking his clothes afterwards.

In describing petitioner's statement to Detective Barbee, defense counsel failed to make any reference to the physical coercion forming the central contention of the defense case. Instead, defense counsel repeated the version of events presented by the prosecution, stating that petitioner agreed to speak with the detective and made a statement "incriminating himself up the ying-yang" (166). Although defense counsel described petitioner's statement as "disjointed," he did not argue that it was the result of physical coercion (165). Defense counsel concluded this first "scenario" by pointing out that petitioner did not receive food or water, and had to ask permission before using the bathroom (167). But since counsel did not draw the conclusion that this constituted part of a pattern of coercion, these facts appeared irrelevant.

During defense counsel's description of the second "scenario," which concerned petitioner's trip to the hospital, he further mischaracterized the medical evidence by telling the jury that petitioner was diagnosed and that his pain was due to an injury (167). However, the doctor did not reach either conclusion.

When defense counsel described a third "scenario," which concerned petitioner's videotaped confession at the District Attorney's office, he failed to refer to any improper coercion by the police. The failure to elaborate on the voluntariness of that confession during summation was particularly harmful to the defense case because counsel had also

48

failed to ask any questions about it either during his direct examination of petitioner or his cross-examination of Assistant District Attorney Okomadu.  Although the jury could have concluded that petitioner's written confession was involuntary based on his own testimony,  notwithstanding defense counsel's failure to discuss this issue in summation, defense counsel did nothing to advocate for such a conclusion.  He did not ask petitioner whether he had been threatened or intimidated by police officers before giving his confession, and he made no such argument during his summation.    These errors ensured that the entire trial record supported the prosecution's theory that the confession was voluntary.

After describing only three scenarios, counsel abandoned his presentation of the "five scenarios."  He then reminded the jury that the complainant had said that Battle was not his assailant (168).  After repeating that petitioner had not been given food or water while at the precinct, counsel concluded his summation by stating: "If he wants to go to the bathroom he's got to ask, think about that" (169).

Instead of arguing that Battle committed the shooting, or that the police used physical coercion to obtain petitioner's confession, defense counsel made repeated, irrelevant references to the fact that petitioner had to ask permission to use the restroom. But while petitioner may have spent a significant amount of time at the precinct, his own testimony clearly established that the coerced confession took place very near the

beginning of this time period, well before going to the restroom or being given food or water would have become an issue.

Petitioner testified that he had exchanged less than ten sentences with Detective Barbee before he was struck for the first time (117-18). They exchanged only a few more sentenced before the detective struck him again, after which petitioner testified that he immediately undertook to transcribe the confession fed to him by Detective Barbee (118-19). Given this sequence of events, the lack of food and drink, and the inconvenience of having to ask permission to use the restroom, which must have occurred after the confession was completed, did not relate to the voluntariness of the confession. Defense counsel's repeated referrals to these facts were, therefore, irrelevant and inexplicable.

Petitioner's claim that his confession was coerced by Detective Barbee's repeated strikes to his chest was only mentioned in passing during summation when counsel stated: "[H]e doesn't want the police officers to hear that he's going to complain about a detective punching him around" (167). Worse still, the argument that Battle was the actual assailant played no role in defense counsel's closing statement. In assessing the effectiveness of the summation as a whole, defense counsel's repetition of irrelevant facts, his failure to present the theories that petitioner's confessions were coerced and that Battle was the actual assailant, and his mention of evidence supporting the prosecution's theory of the case amounted to an incompetent summation constituting ineffective assistance of counsel.

G.    Additional Errors Throughout the Trial Deprived Petitioner of His Right to the Effective Assistance of Counsel

Defense counsel's ineffectiveness was evident in a number of other ways throughout the trial.  For example, counsel failed to use voir dire as an opportunity to identify and strike jurors biased against the defense.

The Sixth Amendment guarantees the right to an impartial jury.  U.S. Const. Amend. VI.  "[T]he principal way this right is implemented is through the system of challenges exercised during the voir dire of prospective jurors,", United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976), and "[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001).  Although "[a]n attorney's actions during voir dire are considered to be matters of trial strategy," Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001) (citing Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997)), "[t]he question of whether to seat a biased juror is not a discretionary or strategic decision" because "[i]f counsel's decision not to challenge a biased venireperson could constitute sound trial strategy, then sound trial strategy would include counsel's decision to waive, in effect, a criminal defendant's right to jury trial." Id. at 463. Therefore, "[a]bsent a showing of a strategic decision, failure to request the removal of

51

a biased juror can constitute ineffective assistance of counsel." <u>Johnson</u> v. <u>Armontrout</u>, 961 F.2d 748, 755 (8th Cir. 1992).

In this case, counsel failed to request the removal of a juror who expressed partiality against the defense.   During voir dire, counsel only asked three general questions of the prospective jurors, all of which he candidly admitted had already been asked by the judge (58).   Defense counsel exercised no challenge for cause to any juror even though five prospective jurors said they had close relatives who worked with law enforcement or the district attorney, three had been victims of crimes, including two armed robberies, and one stated that he had been a police officer for 13 years.   Defense counsel exercised only one single peremptory challenge (61).

After all the jurors had been seated, one of the selected jurors admitted that she was "going to favor" what the police said, and would give more weight to police testimony (68-69).   Even though defense counsel's entire case depended on the jury believing petitioner's testimony over Detective Barbee's, counsel asked the potential juror a series of rehabilitative questions and did not move to strike the juror (69-70).   In response to counsel's leading rehabilitative questions, the juror told the court that she thought police officers were "less likely" to be lying; though she stated she could follow evidence coming from the stand, she admitted that she would still believe the police (70). Counsel merely said, "okay," in response, and did not move to strike the juror (70).

Defense counsel ultimately agreed when the court deemed it "pretty clear" that the juror had to be discharged (70).

By failing to strike the juror despite her insistence that she would be partial to police testimony, defense counsel failed to satisfy one of "the most essential responsibilities" of protecting petitioner's constitutional right to an impartial jury.  See Miller, 269 F.3d at 615.  Although defense counsel ultimately agreed with the court's determination that the juror should be discharged, the question of whether to seat a biased juror is not a strategic decision, see Hughes, 258 F.3d at 463, so his failure to independently request the removal of a biased juror indicated an inability to provide effective assistance of counsel.  See Johnson, 961 F.3d at 755.

Defense counsel also failed to provide effective assistance during the presentation of the prosecution's case.  "The right to effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing," United States v. Cronic, 466 U.S. 648, 656 (1984), and "the importance of cross-examination to the adversarial process in a criminal trial cannot be overstated." Burch v. Millas, 663 F. Supp. 2d 151 (W.D.N.Y 2009).  Therefore, courts have recognized the failure to effectively cross-examine prosecution witnesses as an element of ineffective assistance of counsel.  See Stouffer v. Reynolds (II), 214 F.3d 1231, 1234 (10th Cir. 2000) (finding that counsel's performance was deficient because of various omissions and errors including inability to conduct effective cross-examination

of the State's witnesses); <u>Groseclose</u> v. <u>Bell</u>, 130 F.3d 1161, 1169 (6th Cir. 1997) (same).

Defense counsel in this case failed to effectively cross-examine the State's witnesses; his questions were invariably cursory and irrelevant. During cross-examination of Detective Barbee, defense counsel asked no questions that cast doubt on the voluntariness of petitioner's confession, but merely asked Detective Barbee to confirm that petitioner confessed with "zero problems" and that obtaining the confession "wasn't like pulling teeth or anything" (48). When Detective Barbee agreed that it was not like pulling teeth, counsel simply stated: "that's exactly my point" (48). Given that defense counsel never requested a missing witness charge for Daniel Battle and made no reference to him during summation, his questioning of Detective Barbee about his interrogation of Battle and his knowledge of Battle's whereabouts at the time of trial was irrelevant, at best. At worst, it diminished the extent of the unfavorable inference drawn by the jury regarding Battle's absence by producing an explanation that justified the prosecutor's failure to call him.

Defense counsel's cross-examination of A.D.A. Okomadu, who took petitioner's videotaped statement, was even less relevant than his cross-examination of Detective Barbee. Counsel did not ask A.D.A. Okomadu any questions about the confession or her interactions with any of the parties in the case. Instead, defense counsel opened by asking her whether or not she was familiar with the courtroom (62). He then asked her to identify, in turn, the jury, the District Attorney, and the defendant (63). After A.D.A.

Okomadu identified all these parties, counsel proceeded with a lengthy series of questions about whether a criminal defendant and a jury always sat in the same place, or whether it varied (63-64). When the assistant testified that it depended on the courtroom (63-64), defense counsel concluded: "the point being is you know where the defendant sits, correct?" (64). Defense counsel had no further questions after A.D.A. Okomadu responded, "depending on the courtroom, yes" (64).

None of A.D.A. Okomadu's responses to defense counsel's questioning was ever referenced again during trial and defense counsel never revealed what possible purpose could have been behind this irrelevant string of questions. Defense counsel's cross-examinations of Officer Deleon and Officer Campo were cursory and similarly ineffectual. As a whole, defense counsel failed to use the opportunity to cross-examine witnesses to test the ability of the prosecution's case to "survive the crucible of meaningful adversarial testing." See United States v. Cronic, 466 U.S. 648, 656 (1984). This error, in addition to counsel's numerous other deficiencies, was an element of ineffective assistance of counsel.

H.   Counsel's Cumulative Errors Deprived Petitioner of His Right to Effective Assistance of Counsel

The cumulative effect of defense counsel's errors was to substantially enhance the strength of the prosecution's case and diminish that of the defense. Absent these errors, the only direct evidence would have been petitioner's confession, which he claimed was

coerced. Because the State lacked other strong evidence, there was a reasonable probability that counsel's errors, considered in the aggregate, affected the outcome of the trial.

Given that a court presented with an ineffectiveness claim must consider the totality of the evidence, see Strickland v. Washington, 466 U.S. 668, 698 (1984), consideration of a counsel's errors in the aggregate can demonstrate deficient representation. See Lindstadt v. Keane, 239 F.3d 191, 199, 203-04 (2d Cir. 2001) (finding that consideration of counsel's four errors in the aggregate demonstrated that he did not render professionally competent assistance); see also Pavel v. Hollins, 261 F.3d 210, 223 (2d Cir. 2001) (concluding that counsel's "cumulative errors made his performance constitutionally deficient"); Stouffer v. Reynolds, 168 F.3d 1155, 1163-64 (10th Cir. 1999) (finding that no one instance of error established deficient representation, but that "cumulatively, each failure underscore[d] a fundamental lack of formulation and direction in presenting a coherent defense").

Here, counsel (1) had petitioner testify at the suppression hearing, which elicited negative testimony that he was a gang member and was with Daniel Battle before the shooting, but failed to make an argument for suppression; (2) failed to cross-examine the complainant about his positive identification of Battle as the shooter; (3) failed to object to Detective Barbee's hearsay testimony that Battle told him that petitioner had committed the shooting; (4) failed to object to the prosecutor's repeated comments about

petitioner's pre-trial silence; (5) failed to request a missing witness charge for Battle; (6) presented a disjointed and irrelevant summation that failed to advance the defense theory; (7) failed to use voir dire to remove a biased juror; and (8) failed to effectively test the prosecution's case.

An effective counsel would have emphasized and elicited testimony supporting the defense theory that Battle was the assailant, and would have challenged negative testimony about petitioner and objected to comments deleterious to the defense case. Counsel failed to satisfy any of those responsibilities and his numerous errors demonstrated that his performance fell below an objective standard of reasonableness, and were so serious as to deprive petitioner of his right to effective assistance of counsel as guaranteed by the federal constitution.  See Strickland v. Washington, 460 U.S. 668, 687-88.

## II.   PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING SENTENCING.

The Sixth Amendment right to counsel extends to sentencing.  See Mempa v. Rhay, 389 U.S. 128, 137 (1967).  "[S]entencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel." Gardner v. Florida, 430 U.S. 349 (1977).

Not surprisingly, defense counsel's performance at sentencing, which demonstrated both ignorance of the law and a failure to advocate on petitioner's behalf,

was also ineffective and wrought with errors.  Certainly the most telling aspect of defense counsel's argument at sentencing was his assertion that he did not intend to convince the judge of anything.  It is clear from this statement - as well as from counsel's subsequent statements and his conduct during the trial - that defense counsel had completely abdicated his role as an advocate for petitioner.  At sentencing, it is defense counsel's role to convince the judge to impose a light sentence.  During trial, defense counsel's role is to convince the jury that the defense theory of the case is the accurate theory.  At a suppression hearing, it is defense counsel's role to convince the judge that deleterious evidence should be suppressed.  Defense counsel did not execute any of these roles. Instead, he summed up his performance through all these stages of the trial with the candid statement: "I'm not going to try to convince you of anything" (S. 4).  Because defense counsel did just that throughout the trial - that is, made no attempts to convince neither the jury nor the judge of anything - petitioner received clearly ineffective assistance of counsel.

For instance, counsel's abdication of his role as an advocate played out when the prosecutor argued that petitioner had failed to accept responsibility.  Courts commonly consider a defendant's failure to accept responsibility during sentencing.  See Bohan v. Kuhlman, 234 F. Supp. 2d 231, 271 (S.D.N.Y. 2002); El v. Artuz, 105 F. Supp. 2d 242, 255 (S.D.N.Y. 2000); see also United States v. Boisvert, 499 Fed. Appx. 101 (2d Cir. 2012) (rejecting defendant's challenge to the reasonableness of sentenced based on

factors including failure to accept responsibility); <u>United States</u> v. <u>Li</u>, 115 F.3d 125 (2d Cir. 1997) (finding no impropriety in the imposition of a longer sentence than originally anticipated based on defendant's proclamations of innocence where the court found defendant's conduct manipulative and expressive of her unwillingness to accept responsibility).  In fact, "[t]he sentencing court's discretion is 'largely unlimited either as to the kind of information he may consider, or the source from which it may come," <u>United States</u> v. <u>Carmona</u>, 873 F.2d 569, 574 (2d Cir. 1989) (quoting <u>United States</u> v. <u>Tucker</u>, 404 U.S. 443, 446 (1972)), and "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination."  <u>Id</u>.

Not surprisingly, the prosecutor emphasized the fact the petitioner continued to deny his guilt, writing in her letter to the court: "[o]bviously this defendant has no regard for human life and has shown himself to be incapable of taking responsibility for his actions (November 23, 2009, Letter to the Honorable Alan Marrus from Assistant District Attorney Lisa Berk, in Supreme Court file).  Rather than explain why a defendant pursuing an appeal might refrain from admitting guilt, particularly in light of evidence of third party culpability, defense counsel essentially agreed with the prosecutor when he emphasized that petitioner was "legally guilty" despite continuing to insist that he was innocent (S. 4).  In light of the common practice of considering a defendant's failure to accept responsibility during sentencing, counsel's statement demonstrated ignorance of

established sentencing law.   Counsel's statement that petitioner's behavior while incarcerated had "nothing to do" with this case also demonstrates that counsel was completely unfamiliar with the law applicable at sentencing since the sentencing court can consider "[a]ny information or circumstance".  See Carmona, 873 F.2d at 574.  These indications of counsel's ignorance of sentencing law cannot be part of a reasonable trial strategy, and are "quintessential example[s] of unreasonable performance under Strickland," see Hinton v. Alabama, 134 S.Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland."), given that "sentencing is a critical stage of the criminal proceeding . . . ." Gardner, 430 U.S. at 358.

This inexcusable ignorance of the law, in addition to counsel's own outright admission that he not intend to advocate on petitioner's behalf, clearly proves his failure to provide effective assistance at sentencing.   Therefore, petitioner is entitled to be resentenced.

## III.   PETITIONER IS ENTITLED TO A WRIT OF HABEAS CORPUS

This Court has the power to issue a writ of habeas corpus on petitioner's Sixth Amendment claims because the Appellate Division's decision affirming his conviction and its conclusion that he received a "reasonable defense" involved an "unreasonable application" of "clearly established federal law, as announced by the United States

Supreme Court." 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412-13 (2000);

see White v. Woodall, 134 S.Ct. 1697, 1702 (2014).  The two-part test in Strickland, both

prongs of which are clearly satisfied in this case, qualifies as "clearly established federal

law."  See Williams, 529 U.S. at 391.  Therefore, this Court may issue the writ upon

finding that the state court's application was "objectively unreasonable," see Lockyer v.

Andrade, 538 U.S. 63, 75 (2003); see White, 134 S.Ct. at 1702, and "so lacking in

justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement."  Harrington v. Richter, 131 S.Ct.

770, 786-87 (2011); see White, 134 S.Ct. at 1702.

 The Appellate Division ruled that petitioner was not deprived the effective

assistance of counsel because "defense counsel presented a reasonable defense,

interposed appropriate objections, effectively cross-examined witnesses, and delivered

cogent opening and closing statements" (February 13, 2013, Decision & Order at 1).

This conclusion was not merely incorrect and ungrounded, but also so egregiously

erroneous as to constitute an "objectively unreasonable" application of the Sixth

Amendment principles clearly established by the United States Supreme Court.  See

Williams, 529 U.S. at 409, 411-13; 28 U.S.C. § 2254(d)(1).  Given counsel's numerous

errors - none of which can be termed a strategic decision - throughout various stages of

the case, the Appellate Division's decision "was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." See Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011).

In Henry v. Poole, 409 F.3d 48 (2d Cir. 2005), the court granted the writ of habeas corpus upon finding the New York Court of Appeals' decision an unreasonable application of both prongs of the Strickland test. Id. at 71. First, the court determined that counsel's presentation of a false alibi could not objectively reasonably be deemed a matter of strategy, despite the state court's determination that it was a "tactic," since it had no probative value to establishing the defendant's innocence and could be considered evidence of consciousness of guilt. Id. Second, the court concluded that the Court of Appeals' decision that the defendant had not made a sufficient showing of prejudice was not a reasonable application of Strickland because it did not appear to consider the jury's likelihood to view the false alibi as evincing consciousness of guilt, especially since the prosecutor made such an argument. Id. The court also found that the state court's reference to "'counsel's competency in all other respects'" did not apply the Strickland standard at all. Id.

In Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996), the court granted the writ of habeas corpus upon determining that the state court's decision that the trial counsel had a reasonable trial strategy was an "'error grave enough to be called 'unreasonable'," id. at 1104 (citing Lindh v. Murphy, 96 F.3d 856 (7th Cir. 1996)), given counsel's "woefully inadequate and deficient performance and the prejudice that performance

caused [the defendant]." Id.  Counsel's errors included the failure to use a witness' inconsistent identification testimony, his opening the door to the admission of testimony regarding the investigation of another crime that tended to associate the defendant, and his failure to investigate potential defense witnesses.  Id.

Just as in Henry, many of counsel's decisions, including his decision to have petitioner testify at the suppression hearing without making an argument for suppression, had no probative value to establishing petitioner's innocence.  Therefore, these errors could not objectively reasonably be called "strategy."  Similar to Berryman, the state court's determination that counsel "presented a reasonable defense" because he "interposed appropriate objections, effectively cross-examined witnesses, and delivered cogent opening and closing statements" was a grave and "unreasonable" error.  Not only did counsel fail to object to both Detective Barbee's hearsay testimony and the prosecutor's insinuating comments about petitioner's pre-trial silence, but also he failed to effectively cross-examine the State's witnesses, including Detective Barbee and the complainant.  Counsel's "woefully inadequate and deficient performance" continued through his disjointed and irrelevant summation, and even to the sentencing phase, where he admitted his abdication of his role as an advocate by saying: "I'm not going to try to convince you of anything" (S. 4).  See Berryman, 100 F.3d at 1104.

In the aggregate, counsel's numerous errors throughout the case unquestionably rendered his representation deficient and prejudicial to petitioner's case.  The Appellate

Division's ruling to the contrary was, therefore, an "objectively unreasonable" application of Strickland.  See Lockyer, 538 U.S. at 75.

Moreover, the petition presents no procedural obstacles to issuance of the writ. Petitioner has plainly exhausted his state remedies.  He argued before the Appellate Division that his Sixth Amendment right to the effective assistance of counsel was violated in the numerous ways alleged in this petition.

It is also clear that petitioner did not waive his right to habeas corpus review by failing to comply with any state procedural rule.  Petitioner specifically presented the same arguments raised in his petition through each level of State court review. The Appellate Division relied on no procedural ground in affirming his conviction and denying leave to appeal from the denial of his motion to vacate his conviction (Exhibits E, H).  See Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002);  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).  Accordingly this court may, and should, grant petitioner's petition for a writ of habeas corpus.

## RELIEF REQUESTED

For the reasons set forth above, this Court should grant the petition and order respondent to release petitioner unless, within a reasonable period of time, he is afforded a new trial.

## ADDITIONAL INFORMATION

Petitioner was represented by the following attorneys:

(a)    at pretrial hearings, trial, and sentence, by William Phillips, 26 Court Street 1607, Brooklyn, New York, 11201, 718-935-1954.

(b)    on appeal, by Lynn W. L. Fahey, Attorney-in-Charge, Appellate Advocates, and Paul Skip Laisure, Supervising Attorney, 111 John Street, 9th Floor, New York, New York 10038.

Petitioner was sentenced under one count of an indictment.  He was not sentenced on more than one indictment in the same court at the same time.

Petitioner does not have any future state sentence to serve after he completes the sentence imposed by the judgment under attack.

WHEREFORE, Petitioner prays that this Court:

(1)    Issue a writ of habeas corpus;

(2)    Order respondent to discharge petitioner unless, within a reasonable time, petitioner is afforded a new trial and,

(3)     Grant petitioner such other and further relief as may be just and proper.

Respectfully submitted,

LYNN W. L. FAHEY (LF 1652)
Attorney for Petitioner


_____

By:   PAUL SKIP LAISURE (PL 5560)
APPELLATE ADVOCATES
111 John Street, 9th Floor
New York, New York 10038
(212) 693-0085, ext. 211

November 26, 2014